The next case this morning is Gold Peak Homeowners Association v. GAF Materials, No. 231181. Counsel, you may proceed. Good morning, Your Honors. May it please the Court. I would like to reserve three minutes for a rebuttal, please. A roofing manufacturer shouldn't be allowed to avoid its responsibilities under its own warranty by relying on a hyper-technical reading of its own notice requirements. This is particularly true when homeowners who are supposed to be protected under that warranty provide proper notice. The homeowners paid for the protection of a warranty. They should get it. Moreover, even if there was a delay by homeowners, which there was not, this delay did not prejudice the defendant in any way. Its own conduct proved there was no prejudice. The jury should be allowed to decide all of these issues regarding notice and prejudice. Let's just take a look at some basic facts here. Gold Peak is a community with 40 residential buildings, 4 garage buildings, and hundreds of individual units with 259 individual homeowners. It has an HOA, which is the plaintiff here. Defendant GAF makes roofing sheets. GAF has a training process by which it certifies installers. Gold Peak hired RE Construction as the installer of GAF products, and RE is a GAF-certified master installer. RE Construction has expertise that neither plaintiff nor its residents possess. What we do know is that RE Construction went through a certification process to actually be a master installer for GAF. In 2015, RE Construction installed shingles. In 2016, Gold Peak purchased a 40-year GAF warranty, 40 years, non-prorated period of 20 years on that warranty. A critical fact here is that Gold Peak purchased a warranty through RE Construction. It had no interaction up to that point with GAF at all. The warranty states, if any of your GAF products is found to have a manufacturing defect that adversely affects performance, GAF will pay you the full reasonable cost of labor to repair or recover the affected GAF products and will provide replacement products. That is where GAF failed here. GAF knows that some granule loss on its shingles is, quote-unquote, normal and is not a manufacturing defect. GAF only recommends that it be contacted if, after several months, quote-unquote, the granule loss is still significant or the shingles exhibit other signs of damage. Now, GAF also said the warranty doesn't cover light to moderate granule loss. It put this information into a technical bulletin about the shingles. Well, Counsel, can I ask you then, what does this go to, what you're arguing or talking about right now? Are you suggesting you actually complied with the 30-day period because you discovered it so late, or what does this argument go to? That is correct, Your Honor. I believe that the facts show that the HOA here did, in fact, comply. We have to look at a distinction here between observing that there is granule loss and knowing that there is a problem of granule loss because what the warranty states is that light to moderate granule loss is not something that you need to contact GAF for. Now, it says that if after several months there is significant granule loss, then at that point you contact GAF. Our argument is that the residents of the HOA certainly are not in a position to determine what is light granule loss, what is moderate granule loss, what is significant granule loss. What do they do instead? They rely on the experts. And in this particular situation, they contacted the experts that they knew, RE Construction. RE Construction goes and examines the shingles and tells them there is not a problem here. Yes, there is observable granule loss, but still not a problem. In fact, it is not until August of 2020 that another expert comes in there and says, well, there was a problem. This is more than just light to moderate granule loss. This was actually significant granule loss and a warranty claim should be made. And within seven days of finding that out, the HOA there made a warranty claim. At that point, they were actually compliant when they knew there was a problem. Well, Councilor, are you arguing that Gold Peak needed the opinion of a third party expert before it could be on notice of significant granular loss? In this particular case, Your Honor, yes. And that is because we are dealing with a technical issue. And we don't know when we cross over from light to moderate to significant. Well, how do you get around deposition testimony like that from Ashley Mayer, where she talks about a playground full of sand? Are you saying that a resident can never be the source of notice? Well, if we look at this factually, Your Honor, we're talking about four residents out of 259 homeowners. It's not unusual for various residents to complain about various things that may take place at an HOA. And this particular resident described a playground full of granules. But again, the vast majority of residents here said nothing about excess granules. What if it had been 20 residents? I guess my question is, is the Homeowners Association free to ignore their residents when it comes to notice? I don't think in this particular case, Your Honor, that they did ignore the residents. They did something, the Homeowners Association did something responsible. They contacted the installer. That was the expert in this particular case. The installer comes out there and says, well, we are the master installers here for this particular product. We know this product well, and what we're telling you here is that there is nothing out of the ordinary, so continue to carry on. That was RE? Yes, sir. When did that happen? We know that the latest that this could have happened was by 2018. Then there was nothing of significance, actually, until again in 2019. On July 4th, 2019, there was a hailstorm. And shortly after that, actually a second roofer came out there, and that was Premier Roofing, I believe it's called. Now, Premier Roofing made no note whatsoever of any kind of excessive granule loss. So they certainly were well within their rights to say, well, look, this is a lot of granule loss. You should do something. There was never any kind of indicator of that. The first formal indication that they had here from the experts was actually in August of 2020. And again, within seven days, the HOA here was compliant. So, yes, ultimately I would submit that with respect to the way that the HOA behaved here, they did comply with the notice period. Another thing, Your Honors, I think it's important here to observe that whether the notice actually took place is an issue for the jury. This is something that a reasonable jury could conclude is that the notice actually took place. But when there was a ruling against Gold Peak at summary judgment, that was taken out of the jury's hands. At the very least, that issue alone should be sent back to the jury in order to deal with this issue of notice. They can decide whether the notice was compliant and reasonable or not. I also would like to discuss this issue of prejudice. Now, throughout its briefings, what GAF has argued is that it was prejudiced by examining the shingles in 2020 instead of earlier. Well, let's actually observe GAF's own conduct here. In 2020, it was able to make a determination of coverage on nine claims for settlement and another 10 for a separate issue for something called splicing. So actually, this is a tacit admission by GAF that it was able to actually do the proper evaluation even in 2020. In doing that evaluation, it reviewed documents, photos, and shingle samples and submitted both in-person and drone inspections of the roofs. It was able to do the necessary work. Now, if we look at the Clementi case in Colorado, in Clementi, it was observed that the purpose of a contractual notice requirement is to allow the investigating party, in this case GAF, to adequately investigate and defend a claim. GAF could do that here. In fact, it did that here on nine claims and then an additional 10. Second, this was a 40-year warranty. Well, counsel, can I just back up on this notice prejudice issue that you've now been talking about? Yes, sir. You're saying, where does the notice provision in the warranty say that there's a prejudice requirement that says 30 days, doesn't it? It does. A couple of things about that, Your Honor. Number one, I think by having this 30-day notice requirement, what is effectively happening here is that a 40-day warranty is cut down to a 30-day warranty. And that is something that is extraordinarily prejudicial to the homeowners in this case who would have to pay for the repair of their own roofs. With respect to the notice prejudice issue, though, yes, we are actually asking the court to extend notice prejudice to warranties and not just insurance, as has been done in Colorado before. But you don't have a Colorado case that has done that yet. Is that correct? That's correct, Your Honor. However, what we think is important to observe here is the rationale for why notice prejudice has been extended to uninsured and underinsured motorist coverage in the past. And here we're relying on the Clementi case and the Friedland case. There's a three-part rationale for why notice prejudice has been extended. Number one, in both UIM and liability policies, the policy is usually one of adhesion, with insured having little ability to bargain over policy terms. That is exactly what's happening in a warranty context as well. These homeowners could not go and negotiate their warranty claims. They basically had to take the warranty as it was written. And let's just recognize something that is pretty straightforward here. A warranty is a form of insurance. They are basically two trees or two branches of the same tree. The second rationale for notice prejudice in an insurance context also applies to a warranty. Public policy favors the goal of compensating innocent tort victims, which would be harmed if insurance could avoid coverage due to a late notice by the insured. This applies here as well. We have 259 individual homeowners. They're going to suffer tremendously if they have to pay to replace their own roofs. That cost is going to be passed on to them. And number three, insurers should not reap a windfall by invoking technicalities to avoid coverage that would otherwise be available. Again, this applies here. There would be a windfall here to the warrantor if this warranty is not actually covered. I'd like to reserve my time. Well, just one quick question on notice prejudice. If that is the correct rule, who has the burden on the prejudice issue? I think at that point it would be the burden of the defendant in this case, the warranty company, to actually show that it has been prejudiced in some way due to some kind of a late notice if it had taken place. And that makes sense, Your Honor, because we're talking about a pretty draconian consequence here. If otherwise, they are allowed to avoid their responsibilities under the warranty. And if we're going to have such a draconian effect on the homeowners here, then the standard, the burden here should be pretty high. Good morning, Your Honors. May it please the Court. My name is Nicole Black, and I, along with my co-counsel, Kendra Beckwith, represent GAF Materials LLC in this case. The issues in this matter are quite simple, and I want to direct my time to address some of the matters that have come up in the appellant's opening argument. And namely, it is what are the undisputed facts that are relevant to the issue of notice? I think that's our first issue. And the notice is driven by the written contract itself. The second issue I want to address is this issue of whether expert testimony is required in order to interpret the notice. It is not. And lastly, I would like to address the notice prejudice question that Gold Peak is relying on to argue that prejudice should be read into the contract, which, again, it is not. GAF was awarded summary judgment on all claims by the trial court, and GAF requests that this court affirm the trial court's judgment in its favor. On the first issue of what are the material facts related to the interpretation of the warranty, respectfully, there have been some facts that have been raised today that are not material or are not in the record. Counsel, excuse me. Can you explain what a problem is? Yes, Your Honor. A problem need not be defined by the warranty. The warranty itself is a contract that is interpreted based on the plain language of the contract. And the contract specifically doesn't define a problem. Shouldn't it define a problem if it's going to be used to avoid liability? Respectfully, Your Honor, no. It need not be defined because it's unambiguous in the contract what a problem would be. Well, can you tell me what a problem is then? Sure. We can look to the record, Your Honor. The problem should be defined as the common usage of a problem, common usage of that term. And there is testimony here that, it's undisputed testimony, that a homeowner identified there was a problem and it prompted that homeowner to tell the HOA and the HOA acknowledged that this homeowner said, you should file a warranty claim or consider filing a warranty claim with GAF. So respectfully, Your Honor, the answer to your question is we don't need to add a definition of a problem when a layman's definition and interpretation of a problem prompted a homeowner to say, you should contact GAF for a warranty claim. Now, well, maybe you can come up with a definition just that we could use. Is it something's wrong with the roof? I mean, help me there. The trial court looked to what the homeowners identified as granules coming off the roof and that it was a persistent problem over time. And so the problem can be defined by what was demonstrated in the record as identified over time repeatedly. They needed to address it, and they should have contacted GAF. Well, why wasn't it a problem to start with? Because their instruction said granule loss is not a problem. And now you're saying, well, granule loss is a problem, and everybody should know it. So respectfully, Your Honor, there are two documents we're talking about here. There's the warranty itself, which is a one-page document, and then I believe you're referencing the technical bulletin, which is a separate document, and it is not a document that's part of the contract. It is a document that is publicly available and that the homeowners association or homeowners can reference to identify a problem. Now, specifically, the technical bulletin that you're referencing, which is found at Appellate Volume 2, pages 554 to 555, does say that it's not unusual to have some granule loss coming off the roof for the first couple of months. But then it says, what if it's happening further? It says, how do you know if you have a problem? The technical bulletin actually states that. On its face it says, how do I know if I have a problem? And then it states, several months after application of new shingles, if the following occurs, please contact GAF Warranty Services Department. And the number one item listed is the granule loss is still significant, and number two, the roof starts changing color due to granule loss, number three, or the shingles exhibit other signs of damage. So, Your Honor, when I- What do you do then, counsel, if you get somebody who can get up on the roof, who's an expert, and says, well, that's not a problem? So, Your Honor- You say, well, we're not going to follow you, we're going to do our own guess? Your Honor, this is a case that's up on- that was ruled on on summary judgment, so we do need to look at the specific facts here. And I understand that Gold Peak is suggesting that RE getting up on the roof was an expert, number one, that wasn't ever brought in in the trial court, that they had some expertise, but number two, the testimony that was undisputed, that is the testimony of the HOA corporate designee, stated that they doubted that conclusion, Your Honor. And so the fact that the HOA doubted that conclusion by RE, that there was nothing wrong, should have prompted them, we need to contact GAF. Now, number two, if I may, Your Honor, is that in the warranty itself, in bold, it states that talking to your contractor or installer of the roof is not noticed to GAF. So that specifically identifies that a problem has to be raised with GAF, and it's not sufficient to go to the contractor. So you're talking about the warranty that's contained within the- on page 9 of 10? I'm talking about the systems plus limited warranty. The record set that I have for that, Your Honor, is appellate volume 2 at page 550. Is that 81-7? I've just got a loose sheet here. I don't know if that's 81-7. It was provided at several points in the record, but I can tell you that the record site that I have for it is appellate volume 2 at page 550, which is the copy provided with the- You need a magnifying glass to read it. Well, it's a single-page document, and respectfully, it does state only one obligation for the consumer here, the HOA, which is that they have to provide notice. So specifically, the notice provision states, Your Honor, you must notify GAF about any claim within 30 days after you notice a problem. It was undisputed before the trial court that Gold Peak knew there was a problem in 2018. That was from its own words by its own corporate designee. Could you- You pointed out this is on summary judgment. Correct. Now, who makes the decision on whether it's a problem? The judge? Well, Your Honor, the testimony on that was undisputed, and because it was undisputed, then the court can rule as a matter of law and enter summary judgment on the claim, and that's what happened. That's only if you agree to find a problem. Well, the trial court was correct when it said that it could interpret what a problem was based on the knowledge and the testimony that was undisputed from the HOA. The court didn't find that there was an ambiguity in what a problem was, and specifically, this court need not do that either. Now- Could you- You mentioned the designee. Yes. Your opposing counsel made the point that there were only four of 40 homeowners who complained. If you've only got four out of 40, why isn't there some question about whether there's a problem, or are you linking it to the HOA designee to get there? Could you just kind of put that together? Absolutely, Your Honor. First off, it's not a fact and evidence that there were only four homeowners that complained. There were four undisputed homeowner complaints that were brought- Actually, I apologize, Your Honor. I believe two of them were undisputed that were brought forth on summary judgment. So that's an assumption from the record on summary judgment, that there weren't any other homeowners. But more importantly, to your question about how do we link that up as the knowledge of the HOA, the HOA's own corporate designee, who was the president of the HOA at one of the times, she's the immediate past president, she reviewed the complaints, the maintenance requests, the comments that were submitted to the HOA board, and she confirmed that they had received them at the time. And she confirmed that they had knowledge of it. So respectfully, Your Honor, it's not that GAF relied on the specific homeowners' testimony. It was that the HOA itself acknowledged that they received these complaints, and yet they still didn't notify GAF until August 20th of 2020. Now, the second issue I want to address here is the warranty itself does not require any expert testimony. It doesn't require an expert opinion. And there is no need to infer that into the warranty. Now, in prepping for this argument, it occurred to me that it's an unusual thing for a consumer, such as Gold Peak HOA, to be suggesting that a one-page consumer warranty required them to go get an expert opinion. Because that, in fact, adds an additional requirement onto the HOA that is not favorable to the consumer. So respectfully, the court need not go beyond the plain language of the warranty, which does not require proving up anything at the time you notify GAF. It's simply provide notice of a problem, and then GAF has the opportunity to investigate. So we respectfully request that the court does not infer that expert opinion was needed in this case. There was also— What if they obtain it? What if they do obtain it? Yeah. I mean, I guess that's what your opposing counsel is posing. We couldn't get up on the roof. We got somebody to go up there, and what are we supposed to do when they say there's no problem? Your Honor, that is also not dispositive here, and it does not require reversal on that basis. Because, in fact, there were three roofers that ended up going up on the roof, all of them months and years in advance of when the HOA provided notice to GAF. So, first, it was Ari that went up on the roof. I do not believe that there is record testimony of when they went up on the roof for this court to rely on. Second, there was Premier Roofing, who went up on the roof three separate times, and two of those times hail damage was identified. One of them, the HOA president, identified that he had received the roofing report that indicated there was, at the very least, hail damage and granule loss happening on the roof. And that was in July—the report is July 18 of 2019, and the record site for that is Appendix Volume 2 at 580-87. Now, the third time was when Home Guard Roofing went up in August 20—I think they went up on the roof August 16 of 2020. And it's that particular individual from Home Guard Roofing which the plaintiff is relying on. And, respectfully, if they had three roofers going up on the roof, that should be indicative that they knew that there was a problem from a layman's perspective. Well, what did the second of your descriptions say about the roof? Did they say there's no problem? So the second was Premier Roofers, and they wrote three separate reports, and one identified significant damage. One identified—they used a slightly different wording than significant. And then the first of those reports said no damage. So there is substantial evidence here in the record which is undisputed— it was undisputed that the HOA received the report to show that they knew that they had a problem. Now— Was that a hail damage issue? It may have been hail damage, correct, Your Honor. Premier Roofing went up on the roof because there had been a hailstorm. However, the report reflects— They discovered damage from the hail, correct? Well, they discovered damage, yes. And from the hail, and they spliced, splicing shingles, that type of thing? They did not identify splicing. That was not within their scope. Somebody did. You have a— GAF identified splicing, Your Honor. Respectfully, I'd like to take a quick moment to say that the Notice Prejudice Rule does not apply here, and it's distinguishable for two reasons. Number one, it has been restricted in Colorado to simply applying to cases with tort claims. Number two, in the insurance context. And the Colorado Supreme Court, Judge Matheson, you're absolutely correct. There is no case law that reflects that the Colorado Supreme Court has extended it to apply to this context where there is a private contract. And with that, I will conclude and respectfully ask this Court to affirm the judgment in GAF's favor. Thank you. Thank you. Thank you, Your Honors. Again, I think we have to return to this issue of a complaint versus a problem, and I think this is something that this Court has highlighted today. The contract doesn't define a problem. Now, let us remember a basic rule of contractual interpretation, which is that any ambiguity is interpreted against the drafter. What could GAF have done here? Well, it just listed this spectrum, basically, between minor damage to moderate damage, or I'm sorry, light damage to moderate damage to significant. What it could have done here is actually define what light versus moderate versus significant actually is. What it also could have done here is provide some examples of light versus moderate versus significant. If this ambiguity actually was not resolved, then whoever is looking at these granules has no way, if they don't have expertise, to determine at what point you cross over this bridge from light to moderate to significant. Didn't, though, the second roofing group, the premier group, say that there is, please tell me what we are to take from that report or the three reports. So they called premier roofing, not just out of some kind of a haphazard fashion. They called them in response to a particular event, and that was a hail storm in July of 2019. Premier roofing focused on the hail damage. They really didn't make any kind of note there about any kind of significant granule loss. Now, bear in mind, Your Honor, they certainly could have done that. Premier roofing did come out there three times. They're an expert in roofing. If they observed something else out there while they were out there, they could have said, well, look, maybe we didn't find that much in terms of hail damage, but you have this other issue here or this other problem, Your Honor, which is the granule loss. But they never did that. In fact, when we talk, there was reference made to three experts, but two of the three experts didn't say anything about significant granule loss, and when the third expert actually did in August of 2020, shortly thereafter, Gold Peak went ahead and actually made the warranty claim at that point. By the way, just to correct something, it's not four of 240 homeowners. It's four of 259. There were 40 buildings, so we're talking about a fraction of homeowners here. Thank you, Your Honors. Thank you, counsel. Case will be submitted, and counsel are excused.